SEALED

ORIGINAL

DS127962

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* FRANK J. ZACCANELLI, JR.<br><br>*Relator,*<br><br>v.<br><br>MEHRDAD MOAYEDI, JEFF SHIRLEY, MICHAEL VANHUSS, CENTURION AMERICAN CUSTOM HOMES, INC. DBA CENTURION DEVELOPMENT GROUP, HOLLY JACOBY, PNC BANK, N.A. DBA PNC INVESTMENT CO., LLC, JEFFERIES, LLC, QINGFU XU, H. HARRY AHARAMIAN, A&J CAPITAL INVESTMENT, INC., HENRY ZOU, and HENRY GLOBAL CONSULTING GROUP.<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL CAUSE NO._____<br><br>3-20CV3474-E |

## <u>*QUI TAM* COMPLAINT</u>

Relator FRANK J. ZACCANELLI, JR. (Relator) files this Complaint on behalf of the United States of America against Defendants MEHRDAD MOAYEDI, JEFF SHIRLEY, MICHAEL VANHUSS, CENTURION AMERICAN CUSTOM HOMES, INC. DBA CENTURION AMERICAN DEVELOPMENT GROUP, HOLLY JACOBY, PNC BANK, N.A. DBA PNC INVESTMENT COMPANY, LLC, JEFFERIES, LLC, QINGFU XU, H. HARRY AHARAMIAN, A&J CAPITAL INVESTMENT, INC., HENRY ZOU, and HENRY GLOBAL CONSULTING GROUP (collectively "Defendants") and for cause of action show the Court and Jury:

## I.
## SUMMARY OF THE ACTION

1.      This is a False Claims Act (FCA) case brought pursuant to 31 U.S.C. Sec. 3729-3733.  Relator seeks to recover damages and penalties arising from Defendants' ill-gotten gains obtained by (1) knowingly presenting, or causing to be presented to the United States, false or fraudulent claims for payment or approval; (2) knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims to the United States; and (3) engaging in the systematic practice of intentionally and knowingly submitting false records and statements to the United States.

2.      The fraud perpetrated upon the United States here involves a Ponzi-like scheme to misappropriate over $100 million in federally-subsidized money and federally-regulated money (including foreign loan money) funding a real estate development project known as The Statler Hotel & Residences and Old Dallas Public Library in downtown Dallas, Texas (the Project). Abuse and misuse of public funds by a private developer -- with substantial assistance from its lenders -- has victimized yet another project funded by public money by yet another case of corporate greed and self-dealing on a high-profile, publicly funded project---the beloved Statler.

3.      To make up for a sudden, substantial cash flow shortfall caused by federal authorities investigating fraud by United Development Funding, the largest source of capital for Defendant Centurion American Development Group, Defendants absconded over $200 million from the United States by submitting a new budget for interior finish out of the Project that was fraudulently inflated by over $100 million in order to procure by false pretenses additional funds from three federally controlled and/or regulated sources:

(1)    **EB-5 Loan Fund**: $90 million from the immigration visa program known as EB-5, 8 U.S.C. Sec. 1153, the Immigration and Nationality Act (INA), Sec. 203(b)(5) of the INA, which makes visas available to immigrants investing in new commercial enterprises in the United States that will benefit the U.S. economy and create full-time employment for not fewer than 10 U.S. workers per $500,000 immigrant investment, and regulated by the United States Citizenship and Immigration Service (USCIS), a division of the United States Department of Homeland Security, by submitting false and fraudulent statements, information, and reports to the USCIS in EB-5 Applications for EB-5 Loan Approval, Applications for Approval of Immigration Petitions, and Responses to Requests for Evidence for the purpose of procuring the USCIS's approval and continued approval of initially an $80 million and then $90 million EB-5 loan;

(2)    **Federal Historic Tax Credits**: $60 million from the Federal Historic Tax Credit (FHTC) Program administered by the National Parks Service later fraudulently increased to over $100 million under false pretenses by way of submitting the same fraudulent budget hike from an initial budget of $168 million to up to $290 million as the budget numbers increased on paper but without any substantial increase or change in the scope, design, or quality of or value added to the Project; and

(3)    **TIF Muni-Bond Sale**: $26 million by way of a municipal bond offering regulated by the U.S. Securities and Exchange Commission (SEC) originating from the fraudulent sale of $41 million of a $46 million Tax Increment Finance (TIF) subsidy awarded to the Project by the City of Dallas and sold under the false pretenses that the TIF sale was necessitated by an immediate need for cash investment to fund (for the third time) the same purported budget increase to allow for a change in scope, design, or quality of the

Project that was represented to substantially upgrade the Project's value when no such change of scope, upgrade, or added value ever occurred to the Project.

4.      *Fraud in a Five-Step Plan.* Defendants perpetrated the fraud on the United States by carrying out a five-step scheme.  First, wrongfully terminating the management contract in place with the Project's minority owner who worked with the architect to design and price the Project and then placing the management contract with an employee of the majority owner, thereby eliminating any independent oversight of the Project.  Second, excluding the Project architect from financial and budget meetings and communications in order to leave the architect who designed and priced the Project out of the loop.  Third, falsely increasing the Project budget (or allowing the Project budget to be increased on false pretenses) by over $100 million without changing the design, quality, or scope. Fourth, hiring or allowing the hiring of construction contractors and sub-contractors who were controlled by Defendants Moayedi and CADG to perform the interior finish out construction who, in turn, created false and fraudulent construction cost documents to cover up the bogus budget increase.  Fifth, submitting false and fraudulent budgets and construction documents to the United States to gain payment from or approval of three federal government agencies of over $100 million in federally appropriated or regulated money.

## II.
## PARTIES

5.      Relator, FRANK J. ZACCANELLI, JR., is an individual residing in Collin County, Texas and is the 20% owner of the Project through his partial ownership in the entities Fiamma Partners, LLC, Fiamma Statler, LP, and Fiamma Management, LLC.

6. Defendant, MEHRDAD MOAYEDI, is an individual residing and doing business in Dallas County, Texas and can be serve with summons at his place of business 1800 Valley View Lane., Suite 300, Farmers Branch, Texas.

7. Defendant, JEFF SHIRLEY, is an individual residing in Denton County, Texas and doing business in Dallas County and can be served with summons at 1800 Valley View Lane., Suite 300, Farmers Branch, Texas. Mr. Shirley is the former CEO and President of UDF and senior executive vice-president of Centurion American Development Group.

8. Defendant, MICHAEL VANHUSS, is an individual doing business in Dallas County and can be served with summons at 1800 Valley View Lane., Suite 300, Farmers Branch, Texas. Defendant VanHuss is an employee/affiliate of Centurion American Development Group and was hired by Defendants Moayedi and CADG to replace Relator as Owner's Agent and Property Manager under the title as an officer/employee of Moayedi-owned CAAMCO.

9. Defendant, CENTURION AMERICAN CUSTOM HOMES, INC. dba CENTURION AMERICAN DEVELOPMENT GROUP (CADG or Centurion) is a Texas corporation doing business in Texas and can be served with summons by serving its registered agent, Mehrdad Moayedi, at 1800 Valley View Lane, Suite 300, Farmers Branch, Texas.

10. Defendant, HOLLY COPE JACOBY, is an individual residing in Michigan and/or Florida and can be served at her residence at 51 Monroe Center NW Grand Rapids, Michigan 49503. Ms. Jacoby was the senior executive vice-president of PNC Investment Company, LLC, which was the historic tax credit division of PNC Bank, NA.

11. Defendant, PNC BANK, N.A. DBA PNCIC INVESTMENT COMPANY, LLC ("PNC" or "PNCIC") is a Delaware limited liability corporation with its principal place of business in Pittsburgh, Pennsylvania, and can be served with summons by serving its registered agent within

Texas, CT Corporation. PNC is doing business in the State of Texas and in Dallas County, Texas. PNCIC is a member of a Texas limited liability company, 1914 Commerce Leasing, LLC, the master tenant for the development project made the basis of this lawsuit in Dallas, Texas. PNCIC is also the purchaser of federal historic tax credits in exchange for which PNCIC is an investor member of the project and whose cash investment is funding the project. As a condition to becoming an investor member, PNCIC insisted upon and imposed an Operating Agreement to govern and control the operations of the project that required PNCIC's approval before financial and operations decisions occurred. In the course and scope of its role as investor member making decisions regarding financing, budget, capital, and operations, PNCIC traveled to Dallas, Texas to inspect the project and meet with Defendants Moayedi, Centurion, 1914 Commerce GM, and others about budget, capital, financing, and operations. PNCIC also participated in numerous periodic meetings and conference calls regarding the Project and interacted directly with Relator. Relator' claims against PNCIC arise directly out of PNCIC's partnership with Relator Fiamma Statler, LP, PNCIC's participation in the project as an investor member, and PNCIC' management and control for the Operating Agreement. Indeed, PNC owned 99% of the Project through the Master Tenant, 1914 Commerce Leasing.

12.    Defendant, JEFFERIES, LLC ("Jefferies") is a Delaware limited liability corporation with its principal place of business in New York. Jefferies does business in the state of Texas and can be served with summons by serving its registered agent CT Corporation. Jefferies was the author and publisher of the Official Statement for the TIF bond sale as well as the underwriter, initial purchaser, and then seller of the municipal bonds.

13.    Defendant, QINGFU XU, is an individual residing in Los Angeles County, California and can be served with summons at his place of business at 1609 West Valley Blvd.,

Suite 300, Alhambra, California 91803. Defendant Xu is the President and CEO of Defendant A&J Capital Investments, Inc., the stateside agent of Defendant Henry Global and the manager of the EB-5 fund for the Project.

14.    Defendant, H. HARRY AHARAMIAN, is an individual residing in Los Angeles County, California and can be served with summons at his place of business at 1609 West Valley Blvd., Suite 300, Alhambra, California 91803. Defendant Aharamian is an employee of Defendant A&J Capital Investment, Inc., the manager of the EB-5 fund lending entity.

15.    Defendant, A&J CAPITAL INVESTMENT, INC. ("A&J") is a California corporation with its principal place of business in California, and can be served with summons by serving its registered agent in Texas CT Corporation.

16.    Defendant, HENRY ZOU, is an individual citizen of the Peoples Republic of China and Canada, doing business in Los Angeles County, California where he maintains an office in the United States at 1609 West Valley Blvd., Suite 300, Alhambra, California 91803, and served in the People's Republic of China, at his place of business at 16/F Taikang Finance Tower No. 38 E 3rd Ring N Road, Chaoyang District, Beijing 100026. Zou is the President and CEO of Henry Global Consulting Group, the Chinese fundraising promotor and coordinating agent for the EB-5 loan fund for the Project.

17.    Defendant HENRY GLOBAL CONSULTING GROUP ("HENRY GLOBAL") is a company incorporated under the laws of the People's Republic of China, having its principal offices at 16/F Taikang Finance Tower No. 38 E 3rd Ring N Road, Chaoyang District, Beijing 100026, China. HENRY GLOBAL maintains an office in the United States at 1609 West Valley Blvd., Suite 300, Alhambra, California 91803, along with A&J. Because HENRY GLOBAL does business in the State of Texas but does not maintain a registered agent in Texas, Defendant may

be served with summons by serving the Texas Secretary of State, which may serve HENRY GLOBAL at 1609 West Valley Blvd., Suite 328, Alhambra, California 91803.

## III.
## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction per 31 U.S.C. Sec. 3732(a).

19.    The Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the jurisdiction of this Court by doing business in the State of Texas and conducting business specifically in the cities of Dallas and Farmers Branch, Dallas County, Texas, where Defendants Moayedi and CADG maintain their principal offices and conduct business; specifically, the conduct in question occurred in Dallas, Texas, to wit: the communications, transactions, decisions, wire transfers, checks, and U.S. mail service transmittals involving the EB-5 Application and Petition, Responses to Requests for Evidence, and follow-up and continuing communications and disclosures submitted to the USCIS, preparation for fund raising, budgeting, financing, funding, and use of funding occurred in Dallas County. All or a substantial part of the construction and related services receiving the federally-funded or federally-regulated money occurred in Dallas, Texas.

20.    Specifically, as to Defendant PNC, NA, personal jurisdiction exists generally as PNC, NA does widespread business in Dallas County and all over the Metroplex. Specific personal jurisdiction exists as the assumed name of PNC, NA, PNCIC, is a member of a Texas limited liability company, 1914 Commerce Leasing, LLC, the master tenant for the development project made the basis of this lawsuit and located in Dallas, Texas. PNCIC is also the purchaser of federal historic tax credits in exchange for which PNCIC required that it be inserted as an investor member of the project. The cash proceeds from PNCIC's purchase of federal historic tax

credits are part of the project funding. But PNCIC is not a passive investor. As a condition to becoming an investor member, PNCIC drafted and imposed an Operating Agreement to govern and control the operations of the project that required PNCIC's approval before financial and operations decisions occurred. In the course and scope of its role as investor member making decisions regarding financing, budget, capital, and operations, PNCIC traveled to Dallas, Texas to inspect the project and meet with Defendants Moayedi and CADG about budget, capital, financing, and operations. PNCIC also participated in numerous periodic meetings and conference calls regarding the Project and interacted with Relator regarding the Statler Hotel projected. The claims against PNC arise directly out of PNCIC's partnership with Relator's company, Fiamma Statler, LP, PNCIC's participation in the project as an investor member, PNCIC's imposition of an Operating Agreement requiring PNCIC's approval of financial and operational decisions, and PNCIC's face-to-face communications with Defendants while PNCIC was physically present in Dallas, Texas to meet with other Defendants regarding the fraudulent and self-dealing increases in budget, capital, financing, and funding of the Project as well as numerous other fraudulent and self-dealing transactions made the basis of this lawsuit.

21.    Relator seeks damages from Defendants in an amount that exceeds $1 million, which exceeds the minimum jurisdictional limits of this Court.

22.    Venue is proper in the Northern District of Texas, Dallas Division, as all claims against all Defendants arose from the same transaction or series of transactions and occurrences involving the Project in Dallas, Texas.

## IV.
## FACTUAL ALLEGATIONS

### A.   THE PROJECT

23.   *An Historically Grand Beginning.*  This case centers on the historic Statler Hotel and Old Dallas Public Library in downtown Dallas.  The original Statler Hotel building opened in 1956.  At its height, celebrity guests of the likes of Elvis Presley stayed and performed there.

24.   In 2013, the historical Statler Hotel and The Old Dallas Public Library buildings at 1914 Commerce Street (hotel) and 1954 Commerce Street (library) had remained dilapidated and shuttered for years.  The property was owned by a San Antonio developer who was looking to sell.  Defendants Moayedi and his multi-family residential lot development company, CADG (the largest borrower of United Development Funding, which is currently under federal investigation for Ponzi-scheme practices) had their eye on the Project.  Eventually Moayedi and CADG had the property under contract.

25.   Moayedi and Relator (retired from a long career with Hillwood Development to start his own company and who had just worked on a successful re-development project in San Francisco) had just begun to team up on development deals. Relator agreed to become Moayedi's partner in pursuing the Project.[1]

26.   Relator went to work right away on taking the contract for sale to closing.  But in the early stages of due diligence, Relator realized there was a major problem.  The property owner was in default on the underlying loan.  The contract for sale was doomed to fall through.  Drawing on his experience and connections in the real estate finance and development world, Relator brought

---

[1] See the Declaration of Frank J. Zaccanelli, Jr., attached as Exhibit 1.

*QUI TAM* **COMPLAINT** *Frank Zaccanelli v. Mehrdad Moayedi, et al.* (Statler Hotel) - Page 10 of 61

the lender and property owner together to reinstate the underlying loan, retire the lien and thereby remove the impediment to the sale. By the end of 2013, the deal closed.

27.    Moayedi and Relator became the owners of the Project through the newly-formed company 1914 Commerce GM, Inc. Moayedi was the majority owner and managing member at 75% and Relator the minority owner at 25%. They formed a holding company to hold the land title and debt, Commerce Statler Development Company, LLC, of which 1914 Commerce GM, Inc. owned 80% and served as the managing member.

28.    Relator, through his companies Fiamma Partners, LLC and Fiamma Management, LLC, was to undertake the management of the fundraising, financing, and design and development of the Project. By written agreements, Relator was appointed the Owner's Agent and Representative (through his company Fiamma Statler, LP).

29.    From late 2013 throughout 2014, Relator, by way of his company, Fiamma Statler, and on behalf of 1914 Commerce GM, worked with the architect for the Project, Jerry Merriman and Merriman Anderson Architects, and hired the general contractor for the base-build, Hill & Wilkinson. Relator lead the team of architects, engineers, and cost estimators to develop the Project scope, design, quality, and budget. Design and costing efforts yielded a scope that included the base-build of the hotel, apartments, office space, and food/beverage/entertainment venues and interior finish (excluding interior finish out for venues)[2] at a budget of $168 million.

30.    *The UDF Albatross.* At the time the Project commenced, unbeknownst to Relator, CADG was the largest borrower of United Development Funding (UDF). UDF deploys investor

---

[2] The F/B/E venues were always, from the beginning, treated as an off-balance sheet/off-budget expense of $15.5 million.

capital towards the financing of homebuilders and land developers through private and publicly traded investment funds.

31.    From at least January 2011 through December 2015, UDF used money from a newer fund to pay distributions to investors in an older fund, without adequately disclosing the use of funds and the nature and status of loans made to developers.

32.    In April 2014, the U.S. Securities and Exchange Commission (SEC) began an investigation into UDF as a Ponzi scheme.[3]   Many of the UDF loans under examination by the SEC were made to CADG.  The formerly dependable flow of funds from UDF to CADG was suddenly restricted as the SEC investigation continued.  UDF's executives and two of its funds would be charged by the SEC with multiple counts of fraud, signing false financial statements, and making investor misrepresentations.[4]  In February, 2016, the Federal Bureau of Investigations (FBI) would raid UDF's headquarters in Grapevine, Texas.  In September, 2016, the SEC would issue a notice letter to UDF.  In July, 2018, the SEC's securities fraud suit against UDF would settle for $8.2 million.[5]  In March, 2020, the Public Accounting Oversight Board would sanction, fine, and bar UDF's former auditors for their cooperation in the UDF scheme.[6]  In August, 2020, UDF would be de-registered from public trading by the SEC for ongoing violations.[7]

---

[3] According to the SEC's website, "a Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business."
https://www.sec.gov/answers/ponzi.htm

[4] See https://www.sec.gov/litigation/litreleases/2018/lr24185.htm and https://www.sec.gov/litigation/complaints/2018/comp24185.pdf.

[5] See http://udfexposed.com/assets/content/34-89535-2.pdf.

[6] See http://udfexposed.com/assets/content/105-2020-002-Whitley-Penn.pdf.

[7] See http://udfexposed.com/assets/content/34-89535-2.pdf.

33.     By early 2015, in the wake of UDF submitting to heightened scrutiny while under investigation by federal authorities, Defendants Moayedi and CADG could no longer depend on new cash loans from UDF. It is in this context (unbeknownst to Relator) that Defendants would submit applications to the United States to fund or approve the funding for the Project.

34.     On May 15, 2015, while UDF remained under investigation and Defendants Moayed and CADG, Defendants executed the deliverables necessary to complete the package that makes up the Application to the USCIS for EB-5 loan approval.

35.     In June 2015, (again, unbeknownst to Relator) CADG defaulted on a third-party loan, exposing its urgent need for immediate cash.

36.     *Raising of Federal Funds.* Defendants delegated fundraising to Relator while keeping Relator in the dark about Moayedi's and CADG's connection to UDF and the truth about their financial fragility. So in the first two quarters of 2015, Relator again went to work, this time raising the capital for the Project . by traveling to China with Relator's team. Defendant Moayedi insisted on avoiding conventional loans or traditional private equity investment. Instead, Moayedi intended to build the capital stack by targeting government-sponsored and subsidized programs notorious for being exploited by developer and contractor fraud: federally-approved EB-5 loan funding, federal and state historic tax credits, and municipal tax increment financing.

37.     EB-5. The majority of the capital stack would come from the federal immigration visa program known as EB-5, 8 U.S.C. Sec. 1153, the Immigration and Nationality Act (INA), Sec. 203(b)(5) of the INA, which makes visas available to immigrants investing in new commercial enterprises in the United States that will benefit the U.S. economy and create full-time employment for not fewer than 10 U.S. workers, and regulated by the United States Citizenship and Immigration Service (USCIS), a division of the United States Department of Homeland Security. The EB-5

Program and its regulations offered more lenient job creation-to-investment ration qualifications if the project utilized privately-held companies called "regional centers" that the regulations envisioned to be an independent third-party to facilitate the loan approval application and regulatory compliance process, which opened the door for a cottage industry in the EB-5 finance world. The North Texas EB-5 Regional Center (then owned by the late Gene Phillips, a partner of Moayedi) would administer the application and compliance paperwork. Defendants Zou and his Beijing-based Chinese company, Defendant Henry Global, would serve as the agency for soliciting EB-5 immigrant investors in China. Defendants Xu and Aharamian, and their company, Defendant A&J Capital (also owned by Zou and operated by his sister and brother-in-law, Defendant Xu) would serve as the U.S. contact for Zou's company Henry Global and administer and manage the foreign capital investments in the form of a loan that would fund the construction of the Project from disbursements that A&J Capital would approve. The EB-5 loan would have first-lien priority, thus serving as the senior loan.

38.     In the second quarter of 2015, under the direction of Defendants Moayedi, CADG, Zou, Henry Global, Xu, Aharamian, and A&J, the EB-5 immigrant investment application Form I-924 Request for Approval of I-526 Petition (the Application) was submitted to the USCIS. Representations were made by Defendants to the USCIS in the Application for EB-5 loan approval that the EB-5 loan funds (paid by 170 Chinese immigrant investors to obtain through U.S. Immigration permanent residency in the United States) would be used solely for the purpose of (1) constructing the vertical buildings of the Project; (2) creating 10 jobs per each $500,000 foreign investment. The representations contained in the Application were made by Defendants Zou, Henry Global, Xu, Aharamian, A&J, Moayedi, Shirley, VanHuss, and CADG; were (unbeknownst to Relator) false when made; and (unbeknownst to Relator) known to be false at the time such

representations were made by Defendants Zou, Henry Global, Xu, Aharamian, A&J, Moayedi, Shirley, VanHuss, and CADG, as such Defendants intended at the time of the Application to use the EB-5 loan proceeds to fund other, unrelated, non-EB-5 projects and repay old loans, including loans from UDF.

39.    Federal Historic Tax Credits. In the third quarter of 2015, Defendants CADG and Moayedi also applied for and obtained Federal and State Historic Tax Credits. Federal Historic Tax Credits (FHTC) were awarded by the National Parks Service (NPS). To obtain the award, Defendants CADG and Moayedi submitted a Historic Preservation Certification Application (initially through the State Historic Preservation Office (SHPO), which forwards the application to the NPS). The Application was reviewed and approved by the NPS. Approval of the application and any amendments to the application is conveyed only in writing by duly authorized officials from the Federal Government. The NPS certification decision is made on the basis of the description in the application form.

40.    The application was approved by the NPS for tax credits awarded to the Project in the amount of approximately $60 million on a budget of $168 million.

41.    Defendant PNC (through PNCIC) was in the lucrative business of purchasing FHTC. PNC entered into an agreement with Defendants CADG and Moayed to purchase the FHTC for the Project and, in exchange (purportedly in order to protect its investment), demanded control over the Project by inserting itself as the "Investor Member" of the Master Tenant, 1914 Commerce Leasing, LLC, and via acquisition of a 99% interest in the Master Tenant.

42.    By no means was PNC a passive investor. To the contrary, PNCIC assumed an oversight role on the Statler Project, including control over the terms of leases, the protection of project assets and contracts, approval of changes to the construction budget, and an interest in the

Statler Project's $46 million TIF asset. The best example of PNC's level of involvement and control over the Project is that PNCIC imposed – as a condition to its purchase of the tax credits – that no entity owned or operated by Moayedi or CADG manage the Project. Accordingly, PNC insisted that Relator be appointed manager per a voluminous Omnibus Property Management Agreement for the Project after intense scrutiny and vetting of Relator's qualifications (requesting Relator's social security number, tax returns, financial records, and references to perform background checks). Indeed, the existence of the Management Agreement was a component of the representations relied upon by PNC's own CPAs in providing a tax certificate to PNC for the Statler Project.

43.    PNC's role on the Project proved equally controlling and invasive as its Operating Agreement. Relator participated in multiple weekly conference calls with Defendant Jacoby in which she dictated the direction of the Project with respect to status and timing of completion deliverables, financing, and budget versus actual costs.

44.    Defendants CADG and Moayedi, with the help of Defendants Jacoby and PNC, monetized the FHTC by selling the credits to Defendant PNC through its vice-president, Defendant Jacoby, for tens of millions of dollars, but not just for cash, but also in exchange for PNC obtaining a 99% ownership interest in the Project's Master Tenant entity until the FHTC accrued for transfer and redemption. While PNC awaited accrual of the FHTC, it not only took ownership interest in the Project as collateral, it imposed a several-hundred page Operating Agreement with strict management, operational, financial, reporting, and consent requirements on the Project running in PNC's favor. PNC dictated the flow and management of the Project funds. [8]

---

[8] **Figure 1** above demonstrates the flow and management of Project funds with PNC inserted as 99% owner Investor Member holding consent rights in the form of its Master Tenant Operating Agreement.

*QUI TAM* COMPLAINT *Frank Zaccanelli v. Mehrdad Moayedi, et al.* **(Statler Hotel) - Page 16 of 61**

**Statler - Phase 1 - HTC Closing - November 2015** *(includes partial early release of EB-5 Funds)*



45.     One of the managerial and operational conditions of PNC's and A&J's participation in the financing of the Project that PNC and A&J had in common was the prohibition against conflicts of interest. Both prohibited a majority owner/managing member from managing the Project. That rule prohibited Moayedi or his affiliates, including CADG and its employees or affiliates, from managing the Project. Accordingly, Relator was identified in the EB-5 application

as the manager of the Project in order to fulfill the independent oversight requirement. The USCIS and A&J had approved Fiamma Management as the Property Manager on the EB-5 financing side. The National Parks Service and PNC approved on the FHTC side. USCIS and National Parks Service approved the EB-5 application in reliance on the representations by Defendants Moayedi, CADG, Xu, Aharamian, A&J, Jacoby, and PNC that Fiamma Management would hold the management contract for the Project. The EB-5 and FHTC financing would not have occurred but for Fiamma Management agreeing to serve as and obtaining federal approval to become the Property Manager.

46.    Defendants represented to the USCIS that the EB-5 funding for the Project would be managed through a vetted process of checks and balances and several oversight layers. All funds were to be deposited from the various investor sources into a centralized account controlled through a project disbursement agent. Each month, CADG and Moayedi assembled a periodic request for a draw on the EB-5 loan which was submitted to EB-5 lending entity, Statler 1900 Commerce and its agent, Defendant A&J, the EB-5 Class B Manager, and Defendants PNC and Jacoby for approval and payment.

47.    A&J was required by its contract (*see the Class B Management Agreement*) and the loan documents (*see the EB-5 Loan Agreement*), through Defendants Xu and Aharamian, to review the entire submission with appropriate scrutiny verifying accounting, contractual compliance, verification of actual project progress, budgets, costs, invoices, change orders, pay applications, and confirmation of receipt of all necessary waivers prior to release of payment issuance through the disbursement agent. Likewise, on the FTHC side, all of the same submittals were required by contract (*see the First Amended and Restated Operating Agreement for the Master Tenant 1914 Commerce Leasing, LLC*) to be submitted to PNC and its agent, Defendant Jacoby, for approval.

48. Also, prior to Defendant CADG's submission of Draw Requests, the construction management team and project architect were to review and cross-check each contractor's application for payment for approval and architect certification. A&J was required by the Loan Agreement, as well as by federal law, to oversee, scrutinize, and ensure that the CADG and Moayedi were complying with the loan covenants, requirements, and obligations of the loan documents and meeting economic development conditions to participation and eligibility in the EB-5 program. A&J was obligated by the Loan Agreement as well as applicable law to ensure that the budgets and expenditures were legitimate and that the money disbursed was indeed being used for the purpose of the Project. Likewise, such opportunity for oversight, scrutiny, and approval was required to be given to PNC with respect to the FHTC.

49. However, when A&J and PNC did conduct such review, instead of rejecting the illegitimate budgets, change orders, and payment applications submitted by CADG and Moayedi, A&J and PNC intentionally looked the other way, approving the false budgets and charges and allowing the fraud and breach of fiduciary duty to occur.

50. Beginning in March, 2016, with the door to the vault left wide open by A&J and PNC, instead of including consultants such as the architect and cost consultant, Defendants CADG and Moayedi arranged for the Project's architect, Merriman Associates/Architects (MAA), and the Project's cost consultant, John Hendrickson, to be eliminated from and kept out of the loop on all mandatory cost and budget communications and meetings. As a result, the Project's funding and management process, and instead of being managed through a vetted process, became a self-dealing free for all process that was managed by those with conflicts of interest. At all relevant times, this "process" was allowed and facilitated by A&J and PNC.

51.    Capital investment fundraising efforts for the Project were undertaken in 2015 by Relator in the form of two trips as to the Statler to China on behalf of Relator's partnerships with Moayedi, during which Relator was accompanied by his team members and Defendants Zou, Henry Global, Aharamian, and A&J.   As a result, $80 million in EB-5 funding was raised by securing subscriptions from 170 Chinese immigrants seeking visas to the U.S. for an investment of $500,000 apiece became available in June 2016.   Relator's previous experience as the former President, General Manager, and minority owner of the Dallas Mavericks franchise in the National Basketball Association (NBA) proved attractive to potential Chinese investors due to the NBA's popularity in China and, more specifically, the Dallas Mavericks' acquiring the first Chinese national basketball player ever to play in the NBA, Wang Zhizhi.   Once Relator succeeded in raising the funds for the Project, Defendants Moayedi, Beatty, CADG, Zou, Henry Global, Xu, Aharamian, and A&J solicited Relator's help with a different, unrelated mixed-use project in which Relator was not an owner--- called Mercer Crossing in Farmers Branch, Texas---for which these Defendants sought EB-5 funding in the amount of $250 million.   Relator assisted these Defendants with the EB-5 USCIS application for Mercer Crossing, but because Relator did not desire ownership interest in Mercer Crossing, Relator declined the invitation to participate in fundraising trips to China.   Instead, Relator introducing these Defendants to a former NBA colleague of Relator, Mr. Del Harris, who was a former assistant coach for the Mavericks and the former head coach of the Chinese national basketball team, to provide these Defendants with an NBA connection that proved successful in the raise for the Project. Funds from the Statler Project will end up transferring to Mercer Crossing as will funds from another project, MRW Westlake

Flower Mound, another EB-5 and PID funded project in which Relator is a 20% owner with Moayedi and CADG and the subject of a separate *qui tam* action.[9]

52.    On May 20, 2015, the Loan Agreement for the EB-5 funding (the Loan Agreement) was entered into between Commerce Statler Development, LLC (through its managing member, 1914 Commerce GM, Inc.) as borrower and Statler 1900 Commerce, LLC (through its managing member, A&J Capital (as lender).  The amount of the Loan Agreement was $80 million.

53.    Use of the Loan funds was restricted to the hard and soft costs solely related to the design and construction of the Project (*See* the Loan Agreement at Sec. 2.1.2).  No portion of the Loan funds or proceeds were permitted to be used for any other purpose (*See* Sec. 4.2 of the Loan Agreement).  But, as will be demonstrated below, Defendants CADG and Moayedi would direct millions to unrelated end-uses, including the Mercer Crossing development in Farmers Branch where they office and conduct business.

54.    To ensure compliance with use restrictions, Defendant CADG was to submit Draw Requests for A&J Capital's approval before Loan proceeds would be distributed to Defendant CADG for payment of construction costs (*See* Sec. 3.2.1 of the Loan Agreement). No proceeds from the Loan were paid until a Draw Request was submitted to Defendant A&J Capital for review by Defendants Qingfu Xu and Harry Aharamian and until such Draw Request was approved by Defendants Xu and Aharamian; meaning Defendants Xu and Aharamian of A&J Capital served as the gatekeepers of the disbursement of Loan proceeds.

---

[9] See Cause No. S-20CV2749-X.

55.   Per the conditions imposed by A&J and PNC, a developer's fee in the amount of $9.3 million was permitted to be paid out of the Loan, but the timing and amounts of the payment of the fee were restricted such that (a) only half could be paid upon issuance of a Certificate of Occupancy from the City of Dallas, and (b) the other half after the final loan payment has been made (*See* Sec. 2.7 of the Loan Agreement).[10]  Likewise, but even more restrictive, PNC's HTC Operating Agreement would also restrict the amount and timing of developer fees to be paid to CADG and Moayedi, but both PNC and A&J would approve a developer fee nearly three times the maximum allowed by their own agreements so that CADG could continue defrauding the federal government and A&J and PNC could generate fees and interest from the fraud.

56.   The Loan Agreement also called for Defendant PNC to approve the Loan and to pay $7.3 million as a master tenant equity investment toward re-payment of a bridge loan that would help fund the Project while the Project awaited completion of milestones that required meeting PNC's approval before PNC would complete the purchase of the Federal Historic Tax Credits (FHTC).

57.   Defendant A&J Capital (through Defendants Xu and Aharamian) also required as part of the Loan Agreement that Defendants CADG and Moayedi provide financial statements disclosing financial condition by delivering to A&J (a) un-audited financial statements on a quarterly basis; (b) annual audited financials; and (c) other books and records, including tax returns[11] (*See* the Loan Agreement at Sec. 8.3).  Failure to timely deliver financials amounted to

---

[10] As will be demonstrated below, Defendant CADG will pay itself a developer's fee in the amount of $25 million (from municipal bonds from the sale of the Project's TIF subsidy) and before CO is issued, in violation of the Loan Agreement and state and federal law.

[11] Relator still has not received filed tax returns for 1914 Commerce GM, Inc. despite numerous books and records requests.

a default under the Loan Agreement that afforded Defendant A&J Capital all default remedies, including liquidated damages (*See* Sec. 8.3.7).[12]

58.     Additional reporting requirements under the Loan Agreement called for Defendants CADG and Moayedi to provide to Defendant A&J Capital periodic documentation of compliance with EB-5 regulations (See Sec. 8.22). The Loan Agreement also called upon Defendants CADG and Moayedi to enforce the Master Tenant Agreement and the Property Management Agreement, and failure to do so would result in default of the Loan Agreement (See Sec. 8.23).[13]

59.     Any material changes to the Project's plans and specifications that would materially impact the Project budget required express written notice to and consent of Defendants A&J, Xu, and Aharamian (*See* the Loan Agreement at Sec. 9.3) and Defendants PNC and Jacoby (*See* November 2015 Amended and Restated Operating Agreement for Master Tenant 1914 Commerce Leasing, the "PNC Operating Agreement"). Nor could Defendants CADG and Moayedi cause a material change to the Project's day-to-day controlling and managing personnel without prior notice to Defendants A&J, Xu, and Aharamian and obtaining their written consent (*See* the Loan Agreement at Sec. 9.11) and that of PNC and Jacoby (*See* PNC Operating Agreement).

60.     *The Original Project Plan and Budget.* Relator lead the team and effort in the design, budget, financing, and management of the Project in 2015. Relator worked closely with the architect, Merriman Associates/Architects, for two years regarding the design of the entire

---

[12] Defendants CADG and Moayedi will fail to provide audited or unaudited financials or tax returns and pay no penalty due to Defendants A&J, Xu, and Aharamian refusal to enforce the Loan Agreement's reporting requirements.

[13] Defendants CADG and Moayedi would fail to comply with either Sec. 8.22 or 8.33, but Defendants A&J, Xu, and Aharamian would not enforce compliance.

Project and in the hiring of the general contractor, Hill & Wilkinson, for the design and construction of the exterior to dry wall, i.e. "white box." The budget for the entire Project was originally just over $168 million. Completion was scheduled for October, 2016. Relator lead the efforts and was intricately involved in collaborating with MAA, Hill & Wilkinson, and John Hendrickson on design, budget, cost, and schedule. Relator led countless lengthy meetings over this two-year period with design, construction, and cost teams about every aspect of the Statler Project's scope and cost, and took part in every decision, including even the minute, affecting scope and price.

61.     The initial budget for the Project that was attached to and incorporated into the Loan Agreement at the time of execution was $168,250,000 (*See* Exhibit E of the Loan Agreement). As will be demonstrated below, Defendants Moayedi and CADG would ultimately increase by fraudulent and false means the budget by over $100 million without changing the scope[14], design, or quality of the Project. As demonstrated below, Defendants A&J, Xu, and Aharamian will approve the fraudulent and false budget increase without proof from Defendants Moayedi and CADG providing the backup substantiation documents revealing the changes to the plans and specifications supporting the legitimacy of the budget hike despite the Loan Agreement requiring such proof before the change in plans, specifications, and budget would be approved.

62.     TIF Subsidy. Additional funding for the Project was to derive from another source of public funds, including public financing through federal and state historic tax credits, selling those tax credits to private lenders, municipal tax increment financing, and foreign investment

---

[14] "Change of scope" is a technical design/construction industry term that is controlled by the architect and can only be changed by the architect.

through the federally-regulated EB-5 program, and some private equity. The Statler Project is located in a Tax Increment Finance (TIF) district, which contains 269 acres in the core of Downtown Dallas and Uptown. The district was created to promote the redevelopment of the downtown area, and qualifies for special subsidies such as Federal and State Tax Credits. The City of Dallas approved a TIF grant of $46 million for the Project.

63.     As construction of the white box progressed into the fall of 2015, the Project was proceeding within budget and on schedule to meet the original completion date of 2016. Relator then began focusing the management of the Project and on the bidding and contracting for the finishing out of the building's interior. That is when disagreement arose between Relator and Moayedi, beginning with Moayedi's insistence on hiring inexperienced and unqualified construction management firm, TriArc, to serve as the general contractor to complete the finish out the interior of the building instead of Hill & Wilkinson, an experienced, highly-qualified general contractor who was already mobilized in the building completing the base-build.

64.     TriArc, owned by Moayedi, was a fledgling construction firm. TriArc had little experience with the actual performance of construction in the non-residential commercial sector, let alone constructing the finish out of a building of this magnitude. Hill & Wilkinson, on the other hand, is one of the leading construction firms in the entire southwest. Hill & Wilkinson had already submitted a bid of $40 million to finish out the interior of the Statler Project.[15] Not only was Hill & Wilkinson's bid reasonable, Hill & Wilkinson was infinitely more qualified for the job and already had boots on the ground of the project site as it was completing the white box.

---

[15] See the Hill & Wilkinson interior finish out bid attached as Exhibit 2.

65.   Relator and the Project's architect pointed out that TriArc had very few sub-contractor relationships in the non-residential commercial realm and, thus, did not meet the qualifications required to finish out the building, including the lack of experience supervising construction sub-contractors. Relator also loudly raised the issue of the conflict of interest between the Majority Owner and TriArc. Nevertheless, over the objections of the Project architect, and Relator' vehement objection and protest, Moayedi insisted on hiring its own firm, TriArc, to construct the finish out. Importantly, neither A&J nor PNCIC objected to the obvious conflict of interest – as was their duty.

66.   On October 14, 2015, unbeknownst to Relator, Defendant Moayedi, acting outside of his delegated authority to Relator to enter into contracts for the Project, executed an agreement hiring his construction company, TriArc, as the interior finish out contractor.[16]

67.   On the very same day (October 14, 2015), Defendant Moayedi signed a loan agreement in the amount of $25 million with the late Gene Phillips to fund the Mercer Crossing mixed used development in Farmers Branch, Texas.[17]

68.   *Wrongful Termination/Oversight Elimination.* Relator's opposition to TriArc being awarded the finish-out construction contract (in the fall of 2015) was the beginning of the end of Relator' involvement on the Statler Project. In late February 2016, Relator renewed their demand for TriArc's removal as the finish-out construction contractor. Little did Relator know that Moayedi/CADG had already, unilaterally executed a construction contract with TriArc to build the finish out without telling Relator or the architect.[18]

---

[16] See the CADG-TriArc interior finish out construction contract attached as Exhibit 3.

[17] See the October 14, 2015, Moayedi-Phillips Mercer Crossing Loan attached as Exhibit 5.

[18] See the October 14, 2015 CADG-TriArc Agreement dated October 2015 as Exhibit 3.

69.    Days later, CADG and Moayedi notified Relator of their intent to attempt to immediately terminate Relator as owner's agent and property manager (despite Relator having been approved by A&J and PNC).  This self-serving and unilateral self-dealing maneuver was carried out despite the existence of a written and executed Management Agreement between Relator and CADG which contained a termination clause requiring written advanced notice of any alleged defects in service justifying default.  This notice provision also afforded Relator a specified time opportunity to cure the cited defects. Nevertheless, the Moayedi and CADG abruptly issued a one-page notice of termination summarily and without explanation or citation of any cause, purportedly and wrongfully terminated Relator's contract and role as property manager and owner's agent.

70.    On March 1, 2016, as a result direct result of such refusal, Defendants Moayedi and CADG wrongfully and without cause or authority terminated Relator's position with the Project in retaliation for Relator's refusal to participate in the fraud, and replaced him with an employee of CADG, Michael VanHuss.  Although the Loan Agreement required Defendants Moayedi and CADG to provide written notice to and obtain the express written consent of Defendants A&J, Xu, and Aharamian and PNC before terminating Relator's management contract and replacing Relator with an employee of CADG and Moayedi by forming a new company wholly owned by Moayedi, in defiance of A&J's and PNC's prohibition against such nepotismistic conflict of interest, yet neither A&J, Xu, nor Aharamian enforced the Loan Agreement's requirements nor does PNC enforce its obligations for such written notice or consent, thereby allowing Defendants Moayedi and CADG to wrongfully remove Relator as independent property manager and replace Relator with someone beholden to Moayedi and CADG.  As set forth more fully below, in early 2016, Relator was wrongfully ousted as manager of the Project and deprived of access to the Project

site and any information regarding the Project, including progress reports and books and records. Since that time, only these Defendants have overseen the Project without independent oversight or scrutiny.

71.    *Tri-Arc Triangle.* In early 2016, Defendant Moayedi demanded that Relator hire his construction company, TriArc Construction.[19] Defendant Moayedi told Relator that the EB-5 funds were "ours to use in way we want so long as nobody else knows." Relator refused to hire TriArc and refused participate in such a scheme. With as little as one stroke of the pen, the Moayedi wrongfully removed Relator as the property manager and then proceeded with the hiring his own construction management firm, TriArc, as the interior construction contractor. From there, TriArc in turn, hired sub-contractors TerraBridge and Tri-Tex, affiliated by common ownership and nepotism, to complete the Project's interior construction. All of these acts were prohibited by the EB-5 Loan Agreement and the HTC Operating Agreement, but allowed by A&J and PNC, and their agents/employees Xu, Aharamian, and Jacoby anyway.

72.    *"The champagne, the cavier..."* In March, 2016, just days after Relator's wrongful termination, Defendants Shirley, Moayedi, and VanHuss, acting on behalf of CADG, extend an invitation to Defendant Jacoby of PNC to travel to Dallas to meet with them in the CADG offices to discuss procuring more cash by selling PNC more FHTCs. To do so, Defendants CADG, Moayedi, Shirley, and VanHuss would need to increase the Project budget and apply to the National Parks Service for additional tax credits. After the meeting and post-meeting festivities of wining and dining on champagne, steaks and caviar at Uptown's Nick & Sams Steakhouse,

---

[19] See the Declaration of Frank J. Zaccanelli, Jr. attached as Exhibit 1.

Defendant Jacoby, on behalf of PNC, approves a plan to purchase additional FHTCs for the Project subsequent to a budget increase exceeding $100 million.[20]

### B.    FRAUDULENT BUDGET INCREASE

73.    What followed was the dramatic increase in the Project budget of staggering proportions. Now that the "TriArc Triangle" of contractors were under contract, an extraordinary and unexplained explosion in the interior finish-out cost from the $40 million bid submitted by Hill & Wilkinson to a "new" finish-out budget of over $100 million with the TriArc Triangle at the helm.[21]

74.    During this timeframe, CADG and Moayedi sent correspondence to Relator representing in writing that the Project had been under increasing pressure from A&J and PNC to add more partner equity to the Project's capital stack so that PNC and A&J could demonstrate on paper an added layer of protection of their investment. For example, in the summer of 2016, CADG sought approval from PNCIC and A&J for an initial budget increase in excess of $100 million due to an alleged cost increase of the interior finish out. Shortly thereafter, Relator received a written demand for increased contribution (i.e. a "capital call") from Moaydi demanding additional capital contribution of Relator's portion (25%) of the alleged capital shortfall of $18 million. The capital call was allegedly issued for the purpose of funding a budget increase due to a so-called change in Project scope. Relator were informed the additional capital was requested by the lender and tax credit purchasers, i.e., A&J (for the EB-5 Lenders) and PNC (tax credit purchaser/Investor Member).

---

[20] See the emails between Defendant Jacoby of PNC and Defendants Shirley and VanHuss of CADG attached as Exhibit 4.

[21] The budget increase in excess of $100 million was for interior finish out alone.

75.    Relator demanded documentation supporting the existence of the so-called change in scope that allegedly justified the need for the additional funds.  None were provided.  Because Defendants refused to furnish any information or documents explaining, let alone justifying a budget increase and the need for additional money from the partners, Relator declined to contribute to the capital call on the grounds that it was unsupportable and fraudulent.  The capital call proved only to be lip service as Defendants had already planned to increase the budget, sell the TIF, and obtain additional federal historic tax credits, all of this a foreshadowing of the fraud to come.

### C.    THE SCHEME

76.    *TIF Sale.*  In early August of 2016, on the heels of the fraudulent capital call (issued at the insistence of A&J and PNC), CADG and Moayedi sold the vast majority of the TIF at a substantial discount for the purpose of obtaining immediate possession of cash.  The sale of the TIF asset took the form of what was purported to be tax-free public bond offering, in which $41 million of the Statler Project's $46.5 million TIF was sold for $26 million cash to Jefferies through bonds issued by the Public Finance Authority of the State of Wisconsin and its agent, Orrick. (*See the Jefferies Official Statement*).  Defendant Jefferies served as the underwriter, but also purchased the bonds in the initial sale.  Interestingly, three local Jefferies executives and/or employees left the company just days after the bond sale closed.  Never did Jefferies disclose to Relator that Jefferies was selling a major asset in the capital stack that Relator owned and then, later, Relator receives a K-1 for his percentage of the cash payment made to Moayedi from the proceeds of the TIF bond sale without Relator receiving any monetary distribution of the TIF bond sale proceeds.

77.    The TIF bond sale was not only underwritten by Jefferies, but the bonds issued by the PFA and its agent, Orrick, were purchased by Jefferies, and then sold to the PFA and ---twice, so that Jefferies, Orrick, and the PFA could all churn fees to absorb the monumental discount for

which the TIF bonds were sold---before being purchased by third-party public pension funds of the State of Wisconsin. (*See the Official Statement prepared and published by Jefferies, which contained representations about the Statler Project at Pages 30-41*). However, neither the Relator nor their representatives were notified of the TIF sale plan. Nor were Relator consulted about the contents of the Official Statement. In fact, Jefferies wholly failed to contact Relator during the due diligence process that culminated in the Official Statement. Yet, the PFA utilized the Official Statement when issuing the TIF bonds.

78.    Not surprisingly, in July 2017, the IRS has ruled that the TIF bonds are not tax free, but instead subject to gross income tax. This was contrary to what Jefferies and the PFA and its agent, Orrick, represented to the public-- that the bonds would enjoy tax-free status. Per the IRS ruling, the sale of the TIF did not benefit the public, but rather solely benefited CADG in the form of a so-called developer fee. This fee was prohibited by the EB-5 loan and PNC's Operating Agreement, thereby subjecting the bonds to taxation.

79.    Importantly, the City of Dallas has agreed not to pay TIF subsidy awarded to the Project, thereby rendering the bonds issued on the TIF sale null and void and worthless.

80.    The Official Statement prepared and published by Jefferies contained misrepresentations regarding ownership and management of the project without mention of Relator' existence. Additionally, the increase in budget was represented as being caused by a cost increase due to a change in scope. However, the scope of the Statler Project was not altered. The Fiamma Management was represented as subject to being assumed by a new entity to be formed. The representation was made without mentioning that (1) Relator had already been wrongfully terminated; and that (2) Relation would contest the assumption of their management agreements.

81.     The Official Statement was published by Jefferies with the glaring omission and concealment of the common ownership between Moayedi and the construction manager/interior finish-out construction contractor, TriArc, and its sub-contractors, Tri-Tex and TerraBridge, among others. Additionally, the Official Statement lacked any mention of the fact that the bond sale proceeds recipient (MMCA), had NO interest in the Statler Project, was unrelated to the Statler Project, and just so happened to share a common ownership with the Centurion Defendants.

82.     Moreover, the Official Statement contained representations to the public regarding the Project's funding management processes (*See* para. V., B., 2. of the Official Statement), in spite of the fact that such processes were contaminated with malfeasance and concealment. But the most glaring misrepresentation in the Official Statement was that instead of the bond sale proceeds being allocated to fund budget increases caused by alleged additions to construction cost due to a so-called "change in scope" of the Project's construction, the reality was that the vast majority of the TIF bond sale cash proceeds, if not all of the $26 million to be acquired, were ultimately given to the Centurion Defendants as a developer fee. MMCA (owned by Moyaedi) is created four days and unrelated to the Project altogether before the bond sale receives the cash proceeds of the bond sale directly from Jefferies violates state law prohibiting paying TIF funds to a developer as a developer fee as the TIF proceeds can only be paid to the design and construction of the Project itself, which renders the bonds null, void, and unpayable, leaving the bondholders with a worthless investment.

83.     The TIF sale was concealed from Relator by Defendants. Had Relator been notified of the TIF sale and their input and consent sought, the TIF would not have ever been sold in the first place, or at minimum, the many misrepresentations contained in the Official Statement would have been avoided. Additionally, and, more importantly, the bonds would not have been issued

based on false information.  Jefferies, who issued and bought the bonds only to flip to its bond ally, the Public Finance Authority of Wisconsin, issued the payment of the cash proceeds not to the Project or any entity related to or affiliated with the Project, but to a company wholly-owned by Defendant Moayedi named MMCA, LLC (acronym for "Mehrdad Moayedi Centurion American") created just a few short days before the bond sale closed.

84.     *Four Change Orders in Three Months for $25 Million Supported by Eight Pages*  Incredibly, only *days after* the TIF sale, the first of four consecutive change orders increasing the price of the Project's interior construction by more than $25 million suddenly and inexplicably materialized without any backup bids, product or material schedules, take offs, work orders, pay applications, or invoices explaining the basis for these alleged cost increases.  Nor were there any cancelled checks showing payment to the subcontractors represented to have allegedly performed the work that allegedly caused the cost increase.  In fact, the change orders were accompanied by nothing more than vaguely-worded spreadsheets.  For example, Change Order No. 001, dated August 22, 2016, calls for a cost increase of exactly even amount of $10 million (not a penny more or less), and attached only a one-page exhibit that was little more than a conclusory spreadsheet that stated the area subject to change and its corresponding change in cost:

- **"Cabinets/Vanities/Flooring Trim" increased from $850,598 to $2.475 million;**

- **"Doors, Frames, and Hardware" increased from $85,000 to $1.426 million;**

- **"Tile (Wall Floor) Wood Flooring" increased from $788,000 to $4.317 million;**

- **"Light Fixtures" from $828,000 to $3.7 million.** [22]

---

[22] See the Change Orders attached as Exhibit 5.

These increases were noted on the spreadsheet without any explanation or documentation of the purported increase in price, e.g., upgrade in materials. No pay applications, invoices, or cancelled checks documenting such work was actually performed and paid for exists.

85.    Instead, what commenced just days after the TIF sale's $26 million cash payment to Defendant Moayedi was a total of four change orders issued in mid-August, 2016 through November, 2016 that were *created by Tri-Arc* for the purpose of *paying Tri-Arc* in excess of $25 million, just short of the $26 million in cash paid to CADG in the sale of the TIF. And, all four change orders were backed up by nothing more than a one-page, minimally and conclusory-worded spread sheet apiece. These four, single page change summarily increased the prices by millions of dollars without explanation or back-up support. Yet Defendants PNC, Jacoby, Xu, Aharamian, and A&J, per their own imposed requirements, approved and thus knowingly substantially assisted in perpetrating the fraud.

86.    In late August, 2016, Defendants Moayedi and CADG represented to Relator's team in a face-to-face meeting with the CADG team that the TIF sale occurred "at a substantial discount" based on an increased budget and change orders. Costing consulting John Hendrickson was asked directly to explain the budget increase and how it related to the alleged change in scope, to which Mr. Hendrickson said, "I do not know anything about it. I was not involved in it. I have not seen it." Defendant Shirley attended the meeting and could not explain the basis for the budget increase, the backup documentation for a change in scope (including any change orders), and when asked if he could explain the alleged change orders, he turned pale, and stated looking ill, stated in a shaking voice, "I am not at liberty to speak about that."

87.  As the Project continued, more false change orders were to come in the following year, as in 2017, change orders for the month of April alone totaling $17,571,496.66 were issued by TriArc and were backed up by nothing more than seven pages of vaguely-listed categories such as stone/vanity tops, cabinets, glazing, doors, frames, tile and wood flooring, light fixtures, and TI, without any bids, material catalogs, work orders, sub-contractor submittals with manufacturer or supplier detail, pay applications, invoices, or cancelled checks to demonstrate that the up charges were real, that the work was performed, and the sub-contractors allegedly performing the work were paid.  All of these change orders were approved and submitted by Defendant VanHuss and approved by Jacoby, PNC, Xu, Aharamian, and A&J, without justification other than perpetrating a fraud.

88.  But, at the end of June, 2016, a monumental event of fraud transpired with Defendants Moayedi, VanHuss, Zou, Henry Global, Xu, Aharamian, and A&J conducting a capital raise in China for another CADG/Moayedi project in Farmers Branch, Texas called Mercer Crossing.  The problem was that at the raise meetings, these Defendants represented to the prospective EB-5 Chinese immigrant investors that the money would be invested in the Westlake Entrada/Flower Mound Riverwalk EB-5 fund (called MRW) in which Relator and Moayedi are partners, with no mention of Mercer Crossing, the $250 million EB-5 loan for which had fallen through leaving a gaping hole in Mercer Crossing's capital structure.  These Defendants used the EB-5 platform of MRW to raise money for the suddenly financially-anemic Mercer Crossing. Upon information and belief, Mercer Crossing has received funds earmarked for the Statler Project as the Project's funds have been diverted.

89.  *Additional EB-5 Fraud.*  In mid-2016, Defendants CADG, Moayedi, Shirley, VanHuss, Henry Global, Zou, Xu, and Aharamian submitted reporting to the USCIS that an

additional $10 million in EB-5 loan funds would be tapped for the Project. In their mid-2016 submission, these Defendants presented yet again (this time to the USCIS) the new budget falsely inflated by over $100 million, to gain USCIS approval of the increase in EB-5 loan funding.

90.    *More FHTCs.* In the third quarter of 2016, Defendants Moayedi, CADG, Shirley, and VanHuss then undertook the next scheme to defraud the NPS out of more than another $40 million in FHTCs by submitting the falsely inflated budget with an fraudulent increase of over $100 million. Each of these Defendants played a vital part in developing the false financial data to incorporate into the fraudulently-inflated budget used to scam the NPS to approve the award of FHTC exceeding $40 million.

91.    *The Dallas Morning News Lease and Tenant Improvement Finish Out.* Approval of the additional FHTCs from the National Parks Service based on a false budget increase paved the way for more construction fraud that would benefit Moayedi's construction company, TriArc, and Defendants PNC and Jacoby. PNC's right to the tax credits depended on the Project landing an anchor tenant to enter into a credit tenant lease that demonstrated financial strength of the commercial leasing side of the Project. As such, PNC, as the Investor Member of the Master Tenant, imposed strict control over the terms of any leases, including expressly stated minimums for all leases. All leases required PNC's approval.

92.    Before wrongful termination of his company's management contract, Relator had been negotiating with *The Dallas Morning News* to lease the Old Dallas Public Library as the newspaper's new headquarters. The terms of the negotiations called for market rates that yielded market profit to the Statler Project well within the PNC-imposed stated minimum requirements. The minimums ensured that the Majority Owner would enter into leases that yielded profit to the Statler Project which, in turn, returned profit to the Project owners, including Relator.

93.    Subsequent to Relator's wrongful termination, CADG and Moayedi, with knowingly substantial assistance from Defendant VanHuss as negotiating on behalf of CADG, and at the insistence of PNC, entered into a below-market, commercially-unreasonable, and grossly unprofitable commercial real estate lease of five years with a $7.8 million lease value that was overshadowed by $17 million in credit for tenant improvement interior finish out to be completed by TriArc and under the management of *The Dallas Morning News*. Despite the lease resulting in a net loss to the Project, neither PNC and Jacoby raised any objections to the lease. The lease terms were inexplicably and unjustifiably unfavorable to the Statler Project and were well below reasonable standards for a commercial office space lease in downtown Dallas, which was enjoying (and continues to enjoy) its most landlord-favorable office markets in its history. Raising eyebrows in the commercial real estate industry, the lease signed with *The Dallas Morning News* has been described by local real estate professionals as an incomprehensible steal given that Dallas-Fort Worth is (and was at the time) the leading office market in the nation.

94.    The highly unprofitable deal that Defendants Moayedi, CADG, VanHuss, PNC, and Jacoby afforded *The Dallas Morning News* did not stop with rental rate. In addition, the interior finish out of *The Dallas Morning News* office space (known as "tenant improvement" or "TI") that would normally garner a credit to the tenant of no more than $25/sq. ft. was given away to *The Dallas Morning News* for free at $188/sq. ft. The motivation for entering into such a grossly unprofitable transaction was that the construction contract for the TI was sole-sourced to the Moayedi-owned construction company, TriArc. Under the guise of false/fake bids purportedly submitted from two other local contractors, and because all of the interior TI finish out would be funded by additional federal historic tax credits obtained by fraud through submission of fake budgets and bids to the NPS, TriArc marked up its invoices by at least 200% of actual market

value so it and CADG could pocket the difference. Incredibly, *The Dallas Morning News* entered into a co-development agreement with TriArc affording *The Dallas Morning News* the right to approve or reject all bids, contracts, and change orders for the finish out construction, but allowed TriArc to proceed unchecked because the NPS was paying for the job. What resulted was a finish-out contract to TriArc for $17 million for work and materials that reasonably should have only cost $5 million maximum, with FHTC absconded from NPS funding the difference.

95.    PNC and Jacoby not only knew of the fraud, each substantially assisted in accomplishing such wrongful conduct. PNC had the contractual and legal right, power, and duty to prevent the fraud on the NPS by exercising such right, power, obligation, and duty to point out the fraud. Because PNC stood to benefit greatly from the malfeasance, each chose not to stop it and remained silent.

96.    Relator alerted PNC to the ongoing irregularities in the construction contracting, operation, financing, and budgeting of the Project, including unauthorized and unsupported budget increases, transfers of valuable project assets, wrongful termination of Relator's management role on the Project, and other violations, PNC ignored or encouraged such malfeasance, thereby creating for themselves responsibility for damages and disgorgement sought herein.

## V.
## CLAIMS FOR RELIEF

**COUNT ONE:**        **FRAUD UPON THE U.S.—31 USC Sec. 3729(a)(1)(A) and (B)**

#### A.        FRAUD AGAINST MOAYEDI, SHIRLEY, VANHUSS, AND CADG

97.        The foregoing paragraphs are incorporated herein by reference as if set forth fully below. Defendants' misrepresentations have been described in detail above and will be further described herein.

98.        Defendants Moayedi, Shirley, VanHuss and CADG have knowingly presented or caused to be presented a false or fraudulent claim for payment or approval and knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by way of making false claims, statements, and reports to the United States in violation of 31 USC 3729(a)(1)(A) and (B), in the following respects:

(a)        EB-5 Application submitted to the USCIS in 2016 seeking an additional $10 million in funding that contained a false budget increase of $100 million based on the false pretense that the scope of the Project was changing, that the quality of the Project was improving, and, as a result, the cost of the Project was increasing.  Also, that additional jobs and economic stimulus would be created as a consequence.

(b)        Historic Preservation Certification Application submitted to the NPS in 2016 for an additional $40 million in funding that contained a false budget increase of $100 million based on the false pretense that the scope of the Project was changing, that the quality of the Project was improving, and, as a result, the cost of the Project was increasing.

(c)    TIF Municipal Bond Sale Official Statement Bond Offering submitted to the SEC in August, 2016 for sale of $41 million of the Project's $46 million TIF grant from the City of Dallas for $26 million in cash paid to Defendant Moayedi through a newly-created entity solely controlled by Defendant Moayedi and unaffiliated with the Project that contained a false budget increase of $100 million based on the false pretense that the scope of the Project was changing, that the quality of the Project was improving, and, as a result, the cost of the Project was increasing.

### 1.    Material False Representations

99.    Defendants Moayedi, Shirley, VanHuss, and CADG defrauded the United States by making material, false representations of fact to the USCIS, the National Parks Service, and the SEC.  Specifically, both at the inception and through the course of the EB-5 Loan Application Process and the FHTC application process with the U.S. Parks Service - a time period that extended from at least early 2015 through the beginning of 2018, these Defendants represented to the United States in the EB-5 Loan Application, the Application for FHTC with the U.S. Parks Service, the Official Statement for the Municipal Bond Sale of the TIF, and continuing and periodic disclosure and reporting requirements and obligations that he Project's EB-5, FHTC, and TIF Bond Sale funds:

- Would be and were used solely for the purpose of the construction of the hard and soft costs of the Project as defined by the Loan Agreement, the First Amended and Restated Operating Agreement, and the Official Statement;

- The capital stack of the Project would not be and were not modified (increased, decreased, or addition or subtraction of sources of capital) without notice and consent of the 170 EB-5 immigrant investors;

- The structure of the Project equity ownership would not be and had not been modified (addition, subtraction, or change in equity interest owners) without notice and consent of the 170 EB-5 immigrant investors;

- The budget of the Project would not be and had not been modified (increased or decreased) without notice and consent of the 170 EB-5 immigrant investors;

- The schedule of the Project would not be and had not been modified (hastened or delayed) without prior written notice and consent of the 170 EB-5 immigrant investors; and

- At least 10 jobs would be and were created by each $500,000 investment of each of the 170 EB-5 immigrant investors.

100.    Defendants Moayed and CADG also represented to the United States that Relator would hold management agreements for the control of project operations as the "omnibus" property manager to provide independent oversight and management.

101.    At all relevant times after March 1, 2016, Defendants CADG, Moayedi, Shirley, VanHuss, A&J, Xu, and PNC served as the developers in control of the Project which was operated by Defendant CADG and Moayedi through various entities including 1914 Commerce GM, Inc., 1900 Statler, LLC, 1914 Commerce Leasing, LLC, and Commerce Statler Development, LLC.

### 2.    *Defendants Knew, or Acted Recklessly without Knowledge of the Truth and as a Positive Assertion.*

102.    As set forth more fully above, A&J and Henry Global made representations that were false, and these Defendants knew they were false, or they were made without any regard for their truth or falsity. As set forth above and based upon the credible evidence set forth

herein, Zou, Henry Global, Xu, Aharamian, PNC, and Jefferies planned all along to rubber stamp falsely inflated construction budgets submitted by the Defendants Moayedi, Shirley, VanHuss, and CADG upon Relator's wrongful banishment.

103.    Each of these Defendants knew that their best chance to reap the financial benefits of the proceeds from the three federal/federally-regulated sources was through the un-vetted Moayedi/Shirley/VanHuss/CADG-managed free for all caused by Moayedi's wrongful termination of Relator's management and owner's representative contracts.

104.    **Defendants intended reliance on their Representations.** Each of the Defendants knew the fraudulent budget would be submitted to, reviewed by, and relied upon by the United States with the intent of Defendants obtaining money or approval from the U.S.

**B.      FRAUD---AGAINST ZOU, HENRY GLOBAL, XU, AHARAMIAN, A&J, JEFFERIES, AND PNC.**

105.    The foregoing paragraphs are incorporated herein by reference as if set forth fully below. Defendants' misrepresentations have been described in detail above. Defendants Zou, Xu, Aharamian, Henry Global, A&J, Jefferies, Jacoby, and PNC violated 31 USC 3129(a)(1)(A) and (B) in that they represented to the USCIS that they would:

- conduct a vetted process in accordance with federal law and would ensure the integrity of the Project through independent oversight over the federally regulated money to be used on the Project;

- diligently pursue the Project in accordance with the Project schedules and budgets that were disseminated and/or submitted during this time;

• comply with the federal requirements so that the Project - representations that were critical to the profitability of the Project and the project owners - including Relator; and

• qualified to serve Defendants as lender and lenders' manager in accordance with the federal regulations vetting process.

106. After Relator's wrongful banishment, Defendants represented, directly or indirectly, to the United States that the budget submitted and approved was true and correct and induced the United States to provide money or approval for the Project.

107. All Defendants participated in making the same, or substantially similar statements (identified above in Count One) to induce the United States to approve and continue approving the EB-5 loan, the FHTC, and TIF bond sale.

108. All Defendants reason to know the material falsity of the representations identified and described more fully herein, and/or made the statements recklessly and without knowledge of their truth and as positive assertions. Indeed, given the financial reporting requirements, all Defendants knew or are charged with constructive knowledge of the dire straits of the financial condition of UDF, CADG, and Moayed at, or before the time the aware of them during the course of the vetting process and the heightened risk for fraud.

109. All Defendants intended for the United States to rely upon these misrepresentations so that the United States would approve the application for funding and continue to approve so that Defendants could receive money to fund their fraud.

C.    FRAUD AGAINST A&J/HENRY GLOBAL (collectively "A&J") – EB-5 Lender's Class B Manager

110.    A&J was under written contract with Defendants Commerce Statler Developers (of which Relator owns 20%) and Statler 1900 Commerce to serve as Class B Manager to manage and oversee the disbursement of what was originally $85 million in EB-5 funding (which was later increased to $95 million). Instead of rejecting the fraudulent budgets and costs submitted by the CADG and Moayedi, A&J approved the fraud. A&J made material representations of fact to the USCIS that A&J would (1) comply with A&J's Class B Management Agreement and Loan Agreement, and (2) that A&J would conduct a vetted EB-5 loan management process in accordance with EB-5 regulations and federal law. A&J's representations were false, and A&J knew they were false or were made without regard for their truth or falsity, as A&J planned all along to rubber-stamp any construction budgets and requests for payment from CADG, Moayedi, Shirley, and VanHuss regardless of illegitimacy or legal invalidity.

111.    A&J made such misrepresentations to the United States in the EB-5 Application and in its contracts with Commerce Statler Development specifically intending for the USCIS to rely on the representations and to induce Relator to use their experience, time, experience, and incur out-of-pocket expenses to raise $80 million to fund the EB-5 financing for the Project.

112.    Each of these representations, whether in the EB-5 Application itself or in the attached exhibits to the Applications, were material to the USCIS's reliance in approving the Application and assessing the reliability and legitimacy of the vetting and oversight in the EB-5 loan disbursement process. A&J intended the USCIS to rely on such representations so as to induce the United States to approve the Project. A&J made such representations and continued to make such representations when it knew such representations were false, or when A&J was

reckless as to their truth, as A&J knew or but for careless disregard for ordinary diligence would have known that the illegitimate budgets and costs submitted by CADG and Moayedi and which A&J approved for disbursement were false. Further, the United States was harmed by such conduct and A&J's failure to maintain an independent project manager who would have acted to disclose and to prevent CADG and Moayedi from engaging in financial self-dealing.

113. A&J owed the United States a statutory duty not to defraud the federal government. A&J represented to the U.S. that A&J would manage the Project funds, monitor Project activities, and conduct due diligence in advancing funds in order to preserve and enhance the value of the Project. Further, given A&J's role on the project, A&J owed the United States a duty to disclose the fraudulent activity at issue and intentionally failed to provide such disclosure.

114. A&J either knew its representations were false, or made the representations recklessly, as positive assertions, without knowledge of their truth, intending that USCIS approve the Project as identified herein. A&J refrained from providing information to the USCIS to ensure that the United States did not interfere with scheme created and enacted by CADG and Moayedi, with A&J's assistance and for the benefit of A&J.

115. Further, Relator relied on A&J's representations and failures to disclose in contributing time, effort, expertise, and money to the project. A&J's fraudulent representations and failures to disclose damaged the Relator by devaluing the Relator' interests in the Project and inducing the Relator to spend their own resources in support of the Project when the Relator otherwise would not have.

116. It was then Defendant A&J's duty and obligation to oversee and manage the loans and distribution of the funds and with that obligation came the responsibility of oversight to ensure the funds were used for the sole benefit of Project, not for the benefit of Defendants. However,

Defendants used all or a substantial part of the funds for uses other than the Statler Project or for other unrelated projects.

117.    A&J defrauded Relator by inducing Relator to invest money, time, effort, and experience and talent to raise millions in EB-5 loans, only to have the funds misappropriated by the Majority Owner to others and/or on other projects instead of the Statler Project.

118.    Per its contract and the loan documents attached, as well as per EB-5 regulations, A&J, as the manager of the EB-5 lender, was obligated to manage the status and progress of the construction and budget of the Statler Project. A&J had actual or constructive knowledge regarding the wrongful termination of Relator's management contracts, the fabrication of budget increases to artificially create the appearance of cost increases on the Statler Project without a true change in scope, and the ultimate misappropriation of funds by CADG and Moayedi. A&J has participated in, encouraged, or allowed such malfeasance to detriment of the United States and Relator and for the benefit of Defendants.

119.    A&J, in managing the EB-5 loan, also owed a duty to monitor the Project activities, to receive reports from CADG and Moayedi regarding the Project status and budgets, and to conduct due diligence in advancing funds in order to preserve the value of the Statler Project. (See the Loan Agreement). During A&J's management, construction process, budgeting, and financing schemes were undertaken that a reasonable and prudent loan/lending manager would have identified, investigated, and prohibited. A&J was anything but prudent and, in fact, recklessly allowed and substantially assisted such malfeasance to the detriment of the United States and for the benefit of all of the Defendants.

120.    Additionally, A&J, Xu, and Aharamian not only has the right and the duty to demand the supporting documents from CADG and Moayedi, but also has the obligation to provide

A&J's own documents and information directly to the USCIS as the Class B Manager of the EB-5 loan fund. The job-investment ratio data A&J has submitted through the North Texas EB-5 Regional Center, the $100 million construction budget, the uses of the increased construction budget funds, and the timing of the completion of construction were all representation of fact A&J, Xu, and Aharamian made to the USCIS that were false and misleading, known to be false and misleading at the time they were made to the USCIS, and were intended to induce the USCIS to approve the $10 million increase in the EB-5 loan amount from $80 million to $90 million.

121.    Relator has alerted A&J to the fraud and thus, to the extent A&J's own due diligence has not revealed concerns, Relator has independently raised red flags directly with A&J, yet A&J continues to encourage the malfeasance or ignore it.  A&J is now participating in the withholding of critical information and documents regarding the Statler Project.  A&J's conduct has harmed the ability of the United States to monitor the Project, halt the fraud, and prevent the resulting harm.

122.    A&J had a duty to disclose these material facts, but was deliberately silent, allowing the USCIS to rely on A&J's nondisclosure.  A&J also knew the USCIS was ignorant of the scope of these facts and did not have an equal opportunity to discover same.  By failing to disclose these facts, A&J intended to induce the USCIS to approve and to continue to approve the Application, the EB-5 Loan for the Project, and the increase in the amount of the Loan, instead of rejecting same, taking action, and preventing the fraud and resulting harm.

123.    As demonstrated in the factual allegations in the paragraphs above, the fraud on the United States was not a case of victimless malfeasance.  Relator also relied upon A&J's representations to his detriment by initially investing in and continuing to invest in the Project, both financially and in out-of-pocket costs, time, effort, and agreement to defer receipt of fees and

profits, and sustained the damages alleged herein as a result. As a result and direct and proximate cause of and in reliance upon such representations, Relator suffered damage in the loss of value of his investment and the loss of annual income promised in Relator's Omnibus Property Management Agreement that was wrongfully terminated.

### D.   FRAUD AGAINST JACOBY AND PNC – Historic Tax Credit Investor Member

124.   Defendants Jacoby and PNC are liable to the United States for fraud because Jacoby and PNC, through PNCIC, made written representations of material fact to the NPS, indirectly, by asserting in the Amended and Restated Master Tenant Operating Agreement[23] that PNCIC would exercise its right, power, and control over the Project's construction budget, financing, costs, and disbursements and review and scrutinize the budgets, costs, change orders, and payment applications to ensure legitimacy and use for the sole benefit of the Project before approving same, and then failed or refused to do so, or never intended to do so while Defendants CADG, Moayedi, Shirley, and VanHuss submitted to the NPS and PNC fraudulently-inflated budget increase of over $100 million without reliable and reasonable supporting backup data that PNC knew was or had been submitted to the NPS to procure approval from the United States for additional historic tax credits.

125.   The Project, as a historic rehabilitation and revitalization project, qualified for and received historic tax credits from the NPS. CADG, Moayedi and Relator desired to collateralize the tax credits for early monetization. PNCIC, at the time, a wholly owned subsidiary and division of PNC Bank of Pittsburgh (the fifth largest bank in the U.S.), was in the business of buying federal historic tax credits on historic renovation projects like the Statler.

---

[23] See the Amended and Restated Master Tenant Operating Agreement attached as Exhibit 6

126.    PNC agreed to purchase the federal historic tax credits in exchange for ownership and control of the Project as collateral, which required extensive modification to the Master Tenant's Operating Agreement for the Project, which was rewritten at the time PNCIC was admitted as 99% Investor Member, at PNCIC's insistence, to give PNCIC such rights and power of control and approval.  PNCIC was assigned 99% of all federal historic tax credits of the Master Tenant, together with a 99% membership in the Master Tenant.

127.    Along with its equity interest, PNC gained the power to dictate terms of leases for the Statler Project properties, and PNC's consent was required for entering into and termination of management agreements; for sales of property assets; and for changes to construction plans and specs or construction contracts and for the payment of developer fees.

128.    PNC's fraudulent conduct includes, but is not limited to, making the above written representations and then, contrary to the Amended and Restated Master Tenant Operating Agreement, intentionally and knowingly allowing, approving, and permitting (1) the termination of Relator's management agreement; (2) the selling of the vast majority of the TIF subsidy asset under false pretenses so that CADG and Moayedi could receive a prohibited $23 million developers fee; (3) fraudulent budget increases to justify on paper false increased injections of capital in order to protect its tax credit asset so that the CADG and Moayedi could request the U.S. Parks Service to award over $40 million in additional federal historic tax credits that PNC would purchase from CADG and Moayedi to fund the construction fraud; (4) exorbitant construction cost overruns of unprecedented levels without justification so that CADG and Moayedi could pocket the overage; and (5) a long-term, under-market lease of the Old Dallas Public Library to Belo Corp. and *The Dallas Morning News* that ultimately lost the Project millions of dollars, all of

which caused the approval and payment of the United States and devalued Relator's interest in and investment in the Project.

129.    PNC, by inserting itself voluntarily as the Investor Member that oversaw, managed, and controlled the Project (in order to protect its tax credit purchase investment), owed a duty and obligation to oversee and manage the Project expenditures and leases, and with that obligation came the responsibility of oversight to ensure the funds were used for the sole benefit of Project, not for the benefit of the Majority Owner.  However, in a clear case of quid pro quo the Majority Owner PNCIC sat idly by and/or facilitated things so that Defendants Moayedi, CADG, Shirley, and VanHuss used all or a substantial part of the funds for uses other than the Statler Project or for other projects.

130.    PNC further defrauded the USCIS and Relator by inducing the NPS to approve FHTC only to have the funds misappropriated by CADG and Moayedi to others and/or on other projects instead of the Project.  As such, PNCIC is liable to the United States for damages caused by PNC's own fraudulent conduct.

131.    Defendants PNC and Jacoby owe a legal duty not to defraud the United States. PNCIC's self-described duties related to the Project were to "evaluate the investment, conduct due diligence, take requests for approval through PNCIC's approval process, and to generally manage the due diligence."  PNC represented in writing to the NPS, indirectly, that PNCIC would oversee and manage the Project expenditures and leases, and with that obligation came the responsibility of oversight to ensure the funds were used for the sole benefit of Project and that the leases executed were in the Project's best interests.  Further, given PNCIC's role, PNCIC owed the U.S. a duty to disclose the fraudulent activity at issue and intentionally failed to provide such disclosure. PNCIC either (1) knew its representations were false when made with no intention of scrutinizing

the budgets, costs, change orders, payment applications, and use of TIF bond sale assets to ensure legitimacy or accuracy, or (2) made the representations recklessly, as positive assertions, without knowledge of their truth, intending to approve the activities of CADG and Moayedi all long by rubber-stamping their written submission so that the U.S. approved FHTC and Relator contributed to the Project as identified herein.[24]

132.    PNCIC refrained from providing information to the U.S. Parks Service and Relator to ensure that the U.S. Parks Service and Relator did not interfere with scheme created and enacted by CADG and Moayedi, with PNCIC's knowing substantial assistance.  The U.S. Parks Service and Relator relied on PNCIC's representations and failures to disclose in approving the FHTC and contributing time, effort, expertise, and money to the project.  PNCIC's fraudulent representations and failures to disclose damaged the Relator by devaluing Relator' interest in the Project and inducing the Relator to spend their own resources in support of the project when the Relator otherwise would not have.

E.    **FRAUD: JEFFERIES – Underwriters/Purchasers of TIF Bonds.**

133.    The TIF bond sale was underwritten by Jefferies.  (*See the Jefferies Official Statement*).  Jefferies prepared and published an Official Statement offering the TIF for sale via bonds, a federally regulated security.  The sale of the $41 million in TIF asset amounted to the sale of $8.2 million in value of Relator' 20% interest in the Project. The Official Statement contained the following, numerous material misrepresentations of material facts about the Project that Jefferies knew to be false.  Additionally, Jefferies misleadingly concealed material facts at the time the representations were made and/or were made without regard to their truth or falsity.  The

---

[24] See the emails from Holly Jacoby to CADG attached as Exhibit 7.

material misrepresentations of fact that are either expressly stated in the Official Statement or misleadingly omitted include, but are not limited to:

(a)    **A "change of scope" in the Project upgrading its value required an increase in the budget in excess of $50 million** that necessitated additional cash to complete the Project. But there was no such change of scope; no upgrade. There was no legitimate need for such an increase in the budget. In fact, the funds from the sale of the TIF were paid to Defendant Moayedi and later accounted for as a "developer fee" that, upon information and belief, was diverted from the Project to fund other purposes (e.g., UDF loans, Mercer Crossing).

(b)    **The $23 million funds from the TIF bond sale would be invested in the Project (not paid to CADG for developer fees).** Although over an $40 million in increased construction costs were alleged to have occurred through four change orders beginning in August, 2016 (immediately after the bond sale proceeds of $26 million funded) through November, 2016, no backup documentation exists, such as pay applications, invoices, or cancelled checks reflecting payment for such alleged work. In truth, the TIF bond sale proceeds did not go the construction of the Project, but rather were paid to the Centurion Defendants as a developer fee.

(c)    **TriArc is owned by the Centurion Defendants.** A conflict of interest not disclosed, which allowed for TIF bond sale funds to be paid to TriArc and, ultimately, to and for the sole benefit of the Centurion Defendants instead of the sole benefit of the Project.

(d)    **The TIF bond sale funds that were being paid to MMCA (formed only four days before the sale) were being paid to an entity owned by Mehrdad Moayedi,**

**but wholly unrelated to the Project.** Another conflict of interest known but not disclosed by Jefferies.

(e)    **The Project had no connection with United Development Fund (UDF), under federal investigation for Ponzi scheme fraud.** But the bio of Centurion American's President, Jeff Shirley, promoting Mr. Shirley's experience and qualifications, omitted the fact that Mr. Shirley is the near-past president of UDF.

(f)    **Relator's omnibus property management contract, which had been required by PNCIC, A&J, and the USCIS to ensure a non-managing member entity was serving as property manager to avoid conflicts of interest, was "assumed" by third-parties** when, in fact, Relator had been wrongfully terminated and replaced by a company that is owned by Mehrdad Moayedi and controlled by the Centurion Defendants. Yet another conflict of interest ignored and not disclosed.

134.    Jefferies made material representations to the United States Relator, either directly or indirectly, that the information contained in the Official Statement was true. The information represented by Jefferies to be true in the Official Statement was false.

135.    Jefferies also engaged in material misrepresentations by conduct[25] by intentionally concealing the TIF bond sale from Relator. Employees of Jefferies, at Jefferies' behest, prepared the Official Statement after communicating solely with the Centurion Defendants and to the exclusion of Relator. Despite the duty to do so, Jefferies failed, refused, or chose not to contact Relator or their representatives to fact-check the draft of the Official Statement before publishing to the public for sale.

---

[25] Per Texas common law fraud, deceptive conduct is equivalent to a false statement of fact. *Ten-Cate v. First Nat'l Bank*, 52 S.W.2d 323, 326 (Tex. App.--- Fort Worth 1932, no writ).

136.    Jefferies concealed the sale of the TIF from Relator.  Jefferies then proceeded to either perform the required due diligence investigation into the information represented as fact in the Official Statement and, therefore, knew that the false information and misleadingly omitted information represented as fact in the Official Statement was indeed false and incomplete, or Jefferies recklessly published the false and misleading information without investigating its truth, and recklessly represented the information to be true without performing the requisite due diligence to determine whether or not the information was indeed true.

137.    Jefferies intentionally excluded Relator from the Official Statement, or recklessly failed to perform due diligence in accordance with minimum standards of investigation by failing to identify any of the Fiamma entities.

138.    Jefferies owed the United States and Relator a legal duty not to defraud them. Either intentionally, or with reckless abandon Jefferies brokered and underwrote the TIF bond sale through a fraudulent Official Statement to induce purchase on the municipal bond market.  Jeffries owed a duty to accurately disclose information regarding the Statler Project in the Official Statement and either intentionally failed to provide such disclosure or did so with reckless abandon. Jeffries refrained from providing this information to ensure that the TIF Bond transaction occurred and that the United States and Relator did not interfere with the scheme created and enacted by CADG and Moayedi, with Jefferies' assistance.  By failing to disclose this information, or otherwise notify the United States and Relator of the fraud in the proposed TIF bond sale, Jefferies intended to and did induce the United States and Relator to refrain from taking action to prevent the TIF bond sale.

139.    The United States and Relator relied upon the lack of such information or notice about an impending TIF bond sale in taking no action to stop such sale.  Jeffries' failure to disclose

to or to conceal from the United States and Relator the TIF bond sale and making material misrepresentations of fact in the Official Statement concealed the heightened material risks from the United States and induced the United States to approve and/or allow the bond offering.

**COUNT TWO:    FRAUDULENT INDUCEMENT**

140. The foregoing paragraphs are incorporated herein by reference as if set forth fully below.

141. Defendants induced the United States to approve and continue to approve the Project for funding and approval of the United States as stated fully above.

142. Defendants' misrepresentations referenced throughout the Complaint and summarized in Count 1(B) were intended to be false and mislead the United States and induce the United States to pay Defendants, directly or indirectly, money or provide the Project with approval that would pay Defendants monies.

**COUNT THREE:    SECURITIES VIOLATIONS (SEC. 17(A)(2) AND (3)) BY ALL DEFENDANTS**

143. Relator re-alleges and incorporates by reference each and every allegation asserted in the forgoing paragraphs.

144. By their conduct described above, Defendants have, directly or indirectly, singularly or in concert with each other, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and/or use of the U.S. mail, obtained money or property by means of untrue statements of material fact that were misleading and/or omission of a statement of material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

145. By their conduct described above, Defendants have, directly or indirectly, singularly or in concert with each other, in the offer or sale of securities, by use of the means and

instrumentalities of interstate commerce and/or use of the U.S. mail, engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the United States.

146.   Defendants violated securities laws by making these misrepresentations to the USCIS and misappropriating funds intended solely for the Project and fraudulently marking up the Project cost to an inflated amount in order to increase the profit margin for Defendants Moayedi and CADG and the construction companies they owned, controlled, and/or managed to line their own pockets and/or as a money-laundering scheme to pay investors on older projects with money from the Project and/or to acquire, invest in, or develop unrelated assets, projects, and/or ventures for the purposes of .

147.   By reason of the foregoing, Defendants have violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. Sec. 77q(a)(2)].

**COUNT FOUR: CONSPIRACY/AIDING AND ABETTING**

148.   The allegations in the foregoing paragraphs are fully incorporated by reference as if set forth in full herein.

149.   In violation of 31 USC 3129(a)(2), Defendants Moayedi, Shirley, VanHuss, Zou, Henry Global, Xu, Aharamian, A&J, Jacoby, PNC, and Jefferies have entered into an agreement with CADG to make or cause to be made fraudulent and false claims, statements, and reports to the United States in violation of 31 USC 3129(a)(1)(A) and (B) and/or knowingly or recklessly provided substantial assistance to CADG in making fraudulent and false claims, statements, and reports to the United States in violation of 31 USC 3129(a)(1)(A) and (B).

150.   Defendants Moayedi, Shirley, VanHuss, Zou, Henry Global, Xu, Aharamian, A&J, Jefferies, Jacoby, and PNC had knowledge of, agreed to, and intended to assist in the

carrying out the fraudulent scheme on the part of CADG to do one or all of the following for their own ill-gotten benefit and unjust enrichment, i.e. misuse EB-5, FHTC, and TIF bond sale proceeds directly for fraudulently increasing profit margin for unjust enrichment, to pay of old UDF loans, for the benefit of other projects or as collateral on other projects.

151.    Further, each of these Defendants had knowledge that the other's conduct constituted a false claim or statement to the United States. As described above and herein, each of these Defendants provided substantial assistance in completing these fraudulent transactions and activities, with the intent and understanding that the activities were fraudulent, or with reckless disregard, and such conduct was a substantial factor in making a false statement or claim to the United States.    Defendants received annual and quarterly reporting of CADG, participated in unnecessary budgetary increases and diversions of funds, and were specifically notified by Relator of the fraudulent and false statements.    Therefore, these Defendants had knowledge that the conduct defrauded the United States and intended to assist the other Defendants, as all benefitted from the wrongdoing.

152.    Defendants Zou, Henry Global, Xu, Aharamian, A&J, Jefferies, Jacoby, PNC, Moayedi, Shirley, and VanHuss knowingly permitted CADG to misappropriate the above-referenced federal and federally regulated funds and assisted or encouraged the misappropriation of such funds for purposes other than the hard and soft costs of the Project.

153.    These Defendants were responsible for reviewing, approving, and authorizing the expenditures of the financing, and allowed, approved, or authorized CADG and Moayedi to divert the Project financing funds to pay off old UDF loans and/or to fund other projects or for other purposes (e.g. UDF, Mercer Crossing), thereby assisting and encouraging CADG in its fraud, fraudulent inducement, and securities violations, and causing damages to the United States.

154.   Defendants Zou, Henry Global, Xu, Aharamian, A&J, Jefferies, Jacoby, PNC, Moayedi, Shirley, and VanHuss knowingly allowed CADG to misappropriate EB-5 funds and assisted Moayedi's misappropriation of the Project's funds for purposes other than the Project. These Defendants were responsible for reviewing, approving, and authorizing the expenditures of the financing, and with knowledge, allowed, approved, or authorized Defendant CADG to divert the Project financing funds to other projects or for other purposes (e.g. UDF, Mercer Crossing), thereby intentionally assisting and encouraging the Moayedi Defendants in breaching their fiduciary duty to Relators, and causing damages to Relators. as part of the front-end loaded money grab that came to be what this project was all about with the EB-5 Defendants receiving kickbacks and all Defendants being unjustly enriched at the expense of Relators.  Each of these Defendants' actions, as described above and herein, were essential to CADG;s successful defrauding of the United States.  Each of these Defendants' own conduct, separate and apart from that of the primary actor, himself/herself amounted to fraud on the United States. Defendant CADG simply could not have accomplished the fraud on the United States without the knowing or reckless substantial assistance of the other Defendants.

155.   Further, Defendants Zou, Henry Global, Xu, Aharamian, A&J, Jefferies, Jacoby, PNC, Moayedi, Shirley, and VanHuss (1) have been alleged to have received annual and quarterly reporting of CADG; (2) have been alleged to have participated in unnecessary budgetary increases, illegal fees and kickbacks, and diversions of funds; and (3) were specifically notified by Relator misdeeds and so these Defendants had knowledge that CADG (and their own) conduct constituted a false claim or statement to the United States. These Defendants' knowledge of, and participation in the breaches described herein were a substantial factor in causing the harm to the United States.

156.    Each of these Defendants' own conduct, separate and apart from that of the primary actor CADG, in and of itself was a fraud on the United States. Further, these Defendants intentionally assisted and encouraged the fraudulent acts of CADG in a large scheme, which was a substantial factor in the resulting lack of oversight.  The end result included federally-regulated, subsidized, and/or approved funds were stolen and diverted for other purposes.

157.    These Defendants had knowledge of the pertinent and applicable budget documents and intentionally assisted and encouraged the other Defendants in inducing the United States wherein none of the Defendants intended to be true, to carry out, or to fulfill the representations, statements, data, and information submitted to the United States to approve and to continue to approve so that Defendants could benefit from the funding approval.

158.    As such, Defendants Zou, Henry Global, Xu, Aharamian, A&J, Jefferies, Jacoby, PNC, Moayedi, Shirley, and VanHuss also knowingly or recklessly gave substantial assistance to Defendant CADG in violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. 77q(a)(2)].

## VI.
## DAMAGES

159.    As a result of Defendants' wrongful conduct described above, the United States has been defrauded and thereby sustained actual damages in an amount not less than $3,000 but not more than $10,000 per violation for a total entitlement to recovery of actual damages not less than $1 million in accordance with 31 USC 3729(a)(1).

## VII.
## TREBLE DAMAGES

160.    As described above, are entitled to obtain recovery from all Defendants the amount of such fraud on the United States and misappropriation of the above-mentioned funds not less than three times the actual damages sustained by the United States.

## VIII.
## DISGORGEMENT

161.    Also, pursuant to the equitable remedy of disgorgement, as a result of Defendants' wrongful conduct described above, Defendants unjustly enriched themselves and realized ill-gotten profits. As such, Defendants should be ordered to disgorge to the United States all ill-gotten profits obtained as a result of such wrongful conduct and such ill-gotten profits should be ordered to be awarded to the victims of Defendants' actions.

## IX.
## ALTER EGO

162.    The corporately named Defendants CADG, Henry Global, and A&J are alter egos of each other and the alter egos of Moayedi, Xu, and Zou. Upon information and belief, CADG's owner, Mehrdad Moayedi, is the alter-ego of CADG. Specifically, there is some shared financial interest and control between Moayedi and CADG, there is such a unity between Moayedi and CADG that the separateness of Moayedi and CADG has ceased to exist and holding only Moayedi or only the CADG liable would result in injustice. In addition, Moayedi is using the corporate form of the CADG as a "sham" to insulate himself from liability for his improper and unlawful conduct. Accordingly, Moayedi is personally liable for any liabilities incurred by CADG.

## X.

## RELIEF REQUESTED

**RELATOR REQUESTS** that the Court enter final judgment against Defendants that the United States recover actual damages, treble damages, disgorgement of profits (to victims), and other damages and remedies at law and in equity, pre-judgment and post-judgment interest, attorney's fees, costs, and all recover allowed under law and equity.

Respectfully submitted,

**MACDONALD DEVIN ZIEGLER MADDEN KENEFICK & HARRIS, P.C.**

/s/ Gregory N. Ziegler
**Gregory N. Ziegler**
Texas Bar No. 00791985
GZiegler@macdonalddevin.com

3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2130
214.744.3300 Telephone
214.747.0942 Facsimile

**ATTORNEYS FOR RELATOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served November 23, 2020 on the below-referenced counsel in accordance with the FEDERAL RULES OF CIVIL PROCEDURE.

/s/Gregory N. Ziegler
Gregory N. Ziegler

U.S. Attorney General
U.S. Attorney for the Northern District of Texas